### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### NEW ALBANY DIVISION

| | | |
|---|---|---|
| RICHARD ENGLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00019-TWP-DML |
| | ) | |
| JACKSON COUNTY PUBLIC LIBRARY, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

This matter is before the Court on cross motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 by Plaintiff Richard England ("England") ([Filing No. 22](#)) and Defendant Jackson County Public Library ("JCPL") ([Filing No. 31](#)).  Jackson initiated this action alleging violations of his First Amendment and Fourteenth Amendment rights and seeking declaratory and injunctive relief after he was banned from his local public library for leaving a politically-themed poem at the circulation desk. Shortly thereafter, Jackson moved for judgment as a matter of law. JCPL cross-moves for summary judgment asserting that it possesses the authority to enforce a code of conduct that restricts speech inconsistent with the library's purpose. For the following reasons, the Court **grants** England's Motion and **denies** JCPL's Cross-Motion.

## I.     <u>BACKGROUND</u>

The library is an enduring public institution entrusted with a duty that—while oft-taken for granted—is essential to any functioning society: serving the general public's information needs. Beyond this critical function, public libraries provide a host of free services to its patrons that not only strengthens the bonds of a community, but it also supplies invaluable resources and opportunities. Severing access to such an integral institution is no minor consequence precisely because of the importance of the library's role.

England, a sixty-eight-year-old man, is a resident of Jackson County, Indiana, where he lives a short distance outside the City of Seymour, Indiana (Filing No. 22-2 at 1). JCPL operates multiple public libraries in Jackson County with the main branch located in Seymour ("the Seymour Library") (Filing No. 22-1 at 9). The other two branches are in Crothersville and Medora as well as a traveling book mobile. *Id*. England was a regular visitor to the Seymour Library (Filing No. 31-6 at 6, 21). Living alone and on a limited income provided by the supplemental security income program, England would visit the Seymour Library in lieu of paid entertainment (Filing No. 22-2 at 1).

On November 16, 2020, England visited the Seymour Library to return several items and found several new DVDs that he wished to check out (Filing No. 22-2 at 6). That day, England brought with him an original poem, which he authored, called "The Red Mean." *Id*. The Red Mean was a politically-themed poem that read:

> Know no good,
> Bring out your dead,
> Let them eat cake,
> Off with your head.
>
> Before you become
> Donald Trump's clone,
> Know Satan's reward
> Is only a loan.
>
> Liars are losers,
> Haters are cruel,
> Oh what a pity
> To die such a fool.

(Filing No. 1-1 at 1).

England averred that he had written the poem to "express [his] belief that the politicization of the COVID-19 pandemic by then-President Trump and his followers, including their apparent opposition to rudimentary safety measures . . . was leading and would continue to lead to the

2

unnecessary loss of life." (Filing No. 22-2 at 6.) England intended to give the poem to an employee of the Seymour Library that he was friendly with and who he assumed would enjoy the poem. *Id.* at 7. The employee was not present, so England decided to place the poem in a box on the circulation desk that contained medical face masks intended for library patrons. *Id.* The box containing the masks did not possess a lid or plastic film, so he dropped the poem into the open box on the circulation desk to share his political opinions with the Seymour Library staff and the members of the community at large. *Id.*

About 15 to 30 minutes after England left the Seymour Library, a library employee was providing facial coverings to library customers and when she reached inside the mask box, she noticed the poem entitled "The Red Mean." (Filing No. 31-2 ¶ 16. ) The poem was unsigned and she did not recognize handwriting. The employee suspected (and later confirmed through video) that England was the writer. The library staff was confused and scared. Their fear was enhanced by the political climate surrounding the 2020 election and anxiety surrounding the pandemic. (Filing No. 31-2 ¶ 24.)

England left the Seymour Library without incident; however, when he returned home there was a voicemail from an officer with the Seymour Police Department on his telephone. (Filing No. 22-2 at 8.) Through the voicemail message, England was informed that he was "banned from the Library for the rest of [his] life," and was warned that if he were to return, he would be "arrested for criminal trespass." *Id.* After traveling to the police department headquarters and speaking with the officer who left the voicemail message, England was informed again of the ban because he left the poem at the circulation desk and was told that he would be arrested should he return to the Seymour Library. *Id.*

Upon returning home, England telephoned the Seymour Library. *Id.* He spoke with Mary Reed ("Reed"), the Seymour Library Administrator (Filing No. 22-1 at 6). Reed informed England that "[w]e don't do politics at the library." (Filing No. 22-2 at 8.) For a third time, England was told he was banned from the Seymour Library. Reed informed England he was being banned for leaving the poem and further explained that she had spoken with JCPL's attorney and was assured that the Seymour Library could take this action against him. *Id*. at 9. England was not given an opportunity to explain his poem or his reasoning for leaving it at the circulation desk. He was not given a written notice or justification for his ban nor was he, at the time, informed of the process by which he could challenge the decision. *Id.*

JCPL maintains a Property and Building Use Policy ("Property Policy") (Filing No. 22-1 at 56). The Property Policy outlines the rules and conduct for its facilities and indicates when a library patron may be banned for violating its rules by engaging in prohibited conduct. *Id.* at 19. Among its rules, the Property Policy states, "Library users are expected to conduct themselves in a manner which shows respect for others using the library. Disruptive conduct which prevents others from enjoying the library or which endangers people or property is not allowed." *Id*. at 57. The policy also states, "Habitual offenders may be banned from library property indefinitely." *Id.* The Property Policy identifies an extensive list of specific behaviors that are expressly prohibited, including "Staring at, stalking, intimidation and threatening behavior," as well as "Abusive, threatening, or obscene language." *Id.*

On January 26, 2021, England filed his Complaint for declaratory and injunctive relief against JCPL, alleging violations of the First and Fourteenth Amendments of the Constitution for banning him from the Seymour Library and failing to provide notice and opportunity to be heard before such a decision was taken (Filing No. 1). On April 14, 2021, he moved for summary

judgment (Filing No. 22). On May 12, 2021, JCPL responded to the motion and cross-moved for summary judgment (Filing No. 31).

## II.   LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation

marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

## III.   DISCUSSION

In his Complaint for Declaratory and Injunctive Relief, England raises two legal claims (Filing No. 1 at 6). First, he contends that his ban from the Seymour Library violates the First Amendment of the Constitution. *Id.* Second, he contends that JCPL's failure to offer him notice and opportunity to be heard prior to being banned from the Seymour Library violates the Fourteenth Amendment. *Id.* At summary judgment, England asserts that his ban "impinges on his liberty interests and, insofar as it took place without due process of law, runs afoul of the Fourteenth Amendment." (Filing No. 24 at 13.) He argues further that his ban violates the First Amendment because it violates his right to engage in speech and his right to receive information. *Id.* at 23, 27. England asserts that no disputed issues of fact exist in this case, summary judgment

must issue in his favor, and JCPL should be permanently enjoined from enforcing the ban and allow him access to its branches and facilities. *Id.* at 29.

JCPL cross-moves for summary judgment asserting that England's First Amendment claim cannot succeed because he analyzes his claim under the wrong legal standard (Filing No. 32 at 15). JCPL argues the Seymour Library is a limited public forum and this conclusion is supported by the facts in record. *Id*. JCPL contends that its regulations were reasonable and viewpoint neutral and the decision to ban England was constitutional. *Id*. at 22, 23. JCPL asserts that England's Fourteenth Amendment claim cannot proceed, and he was provided adequate process to challenge the ban. *Id*. at 28, 29. Even if there was a violation, JCPL argues that England would not be entitled to reinstatement and summary judgment is appropriate on both constitutional claims. *Id.* at 35.

## A.  <u>First Amendment Claims</u>

The First Amendment broadly provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I.  England contends that JCPL's decision to ban him impinges on two distinct First Amendment interests: "[England's] right to engage in speech by disseminating his poem, and his right to receive information through continued use of the Library." (Filing No. 24 at 22.) There is no question that these two interests are protected under the First Amendment. *See, e.g., Stanley v. Georgia*, 394 U.S. 557, (1969) (observing that "[i]t is now well established that the Constitution protects the right to receive information and ideas."); *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality) (stating "the right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them") (emphasis in original); *Hill v. Colorado*, 530 U.S. 703, 728

(2000) (declaring the First Amendment protects "the right of every citizen to reach the minds of willing listeners") (citations and internal quotations omitted).

Before a comprehensive analysis of England's First Amendment claims can proceed, the Court must determine the forum category under which the Seymour Library falls. The applicable level of scrutiny to be applied to the First Amendment claims is dependent on which type of forum the Seymour Library qualifies as. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue."). England argues the Seymour Library is a "designated public forum." (Filing No. 24 at 22.) JCPL, om the other hand, contends the Seymour Library is a "limited public forum". (Filing No. 32 at 16.) The Court addresses each of these contentions in turn before directing its analysis to the other issues raised in the parties' respective briefs.

1.       **Forum Designation**

The United States Supreme Court holds, "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed." *Perry*, 460 U.S. at 45.  In *Perry*, the court identified three types of speech fora: public forums, designated public forums, and nonpublic forums.  460 U.S. at 45–49.

In the "quintessential public forums" like streets and parks, for the government or government-entity to enforce a content-based exclusion, it is required to show that the regulation is necessary to serve a compelling state interest and is narrowly tailored to achieve that end.  *Id*. at 45; *see also Carey v. Brown*, 447 U.S. 455, 461–62 (1980) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause

mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized.")

The Seventh Circuit has held that designated public forums "are locations or channels of communication that the government opens up for use by the public for expressive activity." *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011). Designated public forums, like traditional public forums, are subject to strict scrutiny and the government must show that any content-based exclusion of speech is necessary to serve a compelling state interest and narrowly drawn for that purpose. *See id.* at 870. The governmental entity "may enforce reasonable time, place, and manner restrictions provided they are content neutral, they are narrowly tailored to serve a significant government interest, and ample alternative channels of communication exist." 460 U.S. at 45. Public property that is not open for public communication by tradition or designation is considered a nonpublic forum "or not a forum at all." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 667 (1998).

Distinct from the three types of speech fora identified in *Perry* is the "limited public forum," whose provenance and application is often subject to differing interpretations among the courts. *Compare Widmar v. Vincent*, 454 U.S. 263, 269–70 (1981) (applying a strict scrutiny test to a limited public forum analysis), *with Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392–93 (1993) (applying a reasonableness test to a limited public forum analysis), *and Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (applying, again, a reasonableness test to a limited public forum analysis). In *Widmar*, the term "limited public forum" was used to specifically denote a particular subcategory of the designated public forum while other Courts used the term to describe a type of non-public forum. *See Cornelius v. NAACP*

9

*Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985) (applying a reasonable test in a limited forum analysis).

JCPL argues that the Seymour Library is a limited public forum and its decision to ban England requires a reasonableness standard analysis.  As applied, when "the State establishes a limited public forum, the State is not required to and does not allow persons to engage in every type of speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001).  The government may be "justified 'in reserving [its forum] for certain groups or for the discussion of certain topics.'" *Id*. (quoting *Rosenberger*, 515 U.S. at 829).  Such speech in a limited public forum cannot discriminate based on viewpoint, and the restriction must be "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985).

The caselaw cited by JCPL is well-taken and the Court agrees that the Seymour Library is a limited public forum. *See Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1259 (3d Cir. 1992) ("In our view, an application of the Supreme Court's declarations concerning this issue . . . confirm that the Library constitutes a limited public forum, a type of designated public fora."); *see also*, *Rihm v. Hancock Cty. Pub. Libr.*, 954 F. Supp. 2d 840, 855 (S.D. Ind. 2013) ("Indeed, a library is a limited public forum and is thus 'obligated only to permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent in designating the library as a public forum'") (quoting 958 F.2d at 1262).

### 2.  **England's Ban**

The designated evidence supports that the JCPL instituted a *permanent* ban from the Seymour Library against England following the discovery of his poem in the masks box on the circulation desk in November 2020.  Contrary to JCPL's contention that the prohibition was a mere

indefinite suspension with the ability to return if certain steps were taken (*see* [Filing No. 38 at 12](#)), the record demonstrates that following the dissemination of the poem, England was clearly informed by the police department and by Reed that he was "banned from the library." ([Filing No. 22-1 at 39](#).)  There were no caveats or qualifications communicated to England indicating that he could return after a certain period of time or subsequent to taking some stated action.  Indeed, the November 2020 police report notes that Reed requested that England be warned of criminal trespass if he were to attempt to return to the Seymour Library.  *Id*. at 55.  Again, the evidence does not indicate that this warning was to be temporary or able to be challenged and the reasonable inference drawn from this evidence is that the ban was intended to be enduring.  JCPL has not presented definite evidence to rebut this reasonable inference.  *See EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (holding "[A] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion.") (internal quotation marks and citations omitted).

 The Court finds that the prohibition instituted against England on November 16, 2020, was meant to serve as a permanent ban.

### 3.   England's Protected Speech

"The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). The First Amendment's protections extend over actual speech to symbolic or expressive conduct. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 376–377 (1968); *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 505 (1969). Despite its expansive reach, the First Amendment does allow restrictions on the content of certain kinds of

speech.  *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (finding government or government-entity may penalize speech "which by their very utterance inflict injury or tend to incite an immediate breach of the peace").  One such category of speech is the "true threat".  *Watts v. United States*, 394 U.S. 705, 708 (1969) (*per curiam*) (internal quotation marks omitted).

"'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  *Virginia*, 538 U.S. at 359.  England asserts that his poem did not constitute a "true threat" and thus represents protected speech (Filing No. 24 at 24).  The Supreme Court has held that "political hyperbole is not a true threat."  *Watts*, 394 U.S. at 708.  England contends that his poem does not qualify even as political hyperbole because his poem—"The Red Mean"—was, in part, an allusion to a well-known literary reference: "the character of 'the Red Queen' in *Alice in Wonderland*". (Filing No. 24 at 24.)  He argues that JCPL's basis for labeling the poem threatening was Reed's explanation of, "The words. 'Off with your head.' Talking about dying." *Id*. (quoting Filing No. 22-1 at 34, ln 22-24).  England asserts this justification is insufficient to deem the poem as a threat because it cannot be interpreted as threatening anyone, much less an identifiable individual or group of individuals.  *Id.* at 25.

JCPL asserts that several courts have permitted regulation of language that was "far less than a 'true threat'". (Filing No. 38 at 7.) JCPL cites three cases. *Kreimer*, where the court upheld rules banning offensive and disruptive speech by a library patron who engaged in harassing behavior which included following, staring at, and talking loudly to other patrons. *Tronsen v. v. Toledo-Lucas Cty. Pub. Libr.*, where the court upheld a six-month suspension of a male library patron who gave a female patron—whom he did not know—a sexually suggestive note which frightened her, *see id.,* No. 3:08-cv-148, 2008 WL 2622939, at *2 (N.D. Ohio June 30, 2008)

(finding male library patron violated code of conduct prohibiting disruptive and socially non-acceptable behavior). And *Grant-Davis v. Bd. of Trustees of Charleston Cty. Pub. Libr.*, No. 2:15-cv-2676-PMD-MGB, 2017 WL 9360875, at \*21 (D.S.C. May 24, 2017), *report and recommendation adopted*, No. 2:15-cv-2676-PMD-MGB, 2017 WL 3634070 (D.S.C. Aug. 24, 2017), *aff'd*, 710 F. App'x 134 (4th Cir. 2018), where the magistrate judge recommended upholding conduct rules of a patron who violated the rules prohibiting loud, unreasonable and disturbing actions, and threatening behavior.

JCPL contends that libraries can reasonably regulate patrons' speech that interferes with other patrons or employees and the Seymour Library did not need to "wait for England to threaten specific violence or particular people," to address and protect its employees and patrons (Filing No. 38 at 8). JCPL argues England's contention that "the [Seymour] Library could only suspend him for a 'true threat' must be rejected." *Id.* The Court finds this to be a misrepresentation of England's position.

England's position is that his expressive activity of sharing his poem implicates First Amendment protections especially considering it does not constitute a "true threat." (Filing No. 24 at 24–25). The Court agrees.

The cases cited by JCPL to support its argument all featured conduct that was clearly outside of the bounds of normal library activities. Each featured clearly disruptive and socially non-acceptable behavior which is not present in this case. While JCPL argues that *Virginia* and *Watts* and their discussion of "true threats" are "unhelpful", (Filing No. 38 at 8), the Court disagrees. As implied by JCPL's argument and asserted by England, there was no identifiable individual or specific group which The Red Mean targeted for violence and JCPL does not credibly argue that it does. *See Virginia*, 538 U.S. at 359. To be sure, JCPL argues the poem *could* be

threatening to a reader in the context of the ongoing global pandemic and the poem being left in a box of surgical face masks (Filing No. 38 at 11).  However, the Court finds the evidence in the record—specifically the poem itself—does not support this contention.

The Court disagrees with England's assertion that his poem does not constitute political hyperbole. The Red Mean's literary allusion, negative reference to the former president of the United States, and England's disdain for the politicization of masks, coupled with his morbid references to lives lost as a result of the pandemic qualify as political hyperbole in the estimation of the Court.  Like the petitioner in *Watts*, the offense of The Red Mean was "a kind of very crude offensive method of stating a political opposition to the President," and associated governmental policies and positions.  394 U.S. at 708.  As such, England's poem was not a "true threat" and constituted expressive activity that invokes First Amendment protections.

Though more commonly found in the analysis for First Amendment retaliation suits involving public employees, England argues he has demonstrated causation between his speech and the subsequent adverse action of being banned from the Seymour Library (Filing No. 24 at 24); *see Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) (addressing "retaliation" in the First Amendment context).  For what it is worth, the Court finds that the designated evidence shows that England has demonstrated a causal link between his poem and JCPL's decision to ban him from the Seymour Library.

JCPL admits that following the Seymour Library staff's "determination that England was responsible for placing the poem in the box of sanitary masks," Reed decided to ban him (Filing No. 32 at 10). While JCPL provides several reasons for Reed's decision, the first reason provided was that she "felt the poem was threatening", especially considering the "imagery discussing death and horrific images." (Filing No. 32 at 10.)  It is indisputable that England's poem was a factor that

motivated JCPL's decision to ban him.  *See Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004), *abrogated on other grounds*, 481 F.3d 961 (7th Cir. 2007) ("To clarify, a motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions.").

The Court finds that England was engaged in expressive activity when he left The Red Mean at the circulation desk in November 2020 and such speech implicates the First Amendment and its protections.

**4.       Constitutional Standard of Review**

JCPL correctly identifies the Seymour Library as a limited public forum and requests the Court apply a reasonableness standard.  However, after a careful review of the evidence in the record, the Court finds the expressive activity England engaged in is consistent with the nature of the library and consistent with the government's intent in designating the library as a public forum. *See* 958 F.2d at 1255.  As such, a higher standard is required to analyze JCPL's decision to restrict England's permitted expressive activity through a permanent ban.  This determination is consistent with the cases cited by JCPL (*see* Filing No. 32 at 21) ("*Kreimer, Neinast[1], Armstrong[2], Rihm,* and *Grant-Davis* all recognized that regulations were subject to a reasonableness analysis if they addressed speech that was inconsistent with library-related activities, *while applying a stricter standard to regulation of speech associated with library activities*.") (emphasis added).

---

[1] *Neinast v. Bd. of Trustees of Columbus Metro. Libr.*, 346 F.3d 585 (6th Cir. 2003) ("As such, the Library 'is obligated only to permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent in designating the Library as a public forum.'") (quoting *Kreimer*, 958 F.2d at 1262).

[2] *Armstrong v. Dist. of Columbia Pub. Library*, 154 F.Supp.2d 67, 75 (D.D.C.2001) (applying a stricter standard because "The regulation at issue allows for the denial of library access based on a patron's personal appearance. Since the effect of such a regulation is to prevent certain patrons from engaging in any conduct within, or use of, the library, protected First Amendment activities such as reading, writing and quiet reflection are directly limited.").

As acknowledged by the parties, one of the fundamental purposes of the public library is "the acquisition of knowledge" and providing a place for "reading, writing and quiet contemplation." *Kreimer*, 958 F.2d at 1261. England's politically-hyperbolic written poem, left quietly at the Seymour Library circulation desk for the contemplation of any patron or person who happened upon it, falls within the spectrum of permitted First Amendment activities. JCPL's Property Policy explicitly noted, "Disruptive conduct which prevents others from enjoying the library or which endangers people or property is not allowed," and "Habitual offenders may be banned from library property indefinitely." (Filing No. 22-1 at 57.) However, the evidence in the record does not support that England engaged in disruptive conduct that prevented other patrons from enjoying the library or otherwise endangered them through the inconspicuous dissemination of his poem.  Establishing that England engaged in permitted expressive activity, the Court applies a strict scrutiny standard to JCPL's decision to permanently ban him from the Seymour Library. *See Bauer v. Shepard*, 634 F. Supp. 2d 912, 940 (N.D. Ind. 2009), *aff'd as modified*, 620 F.3d 704 (7th Cir. 2010) ("Although political speech is not beyond all restraint, courts apply the strict scrutiny test to any regulation that would curtail it.").

Furthermore, the designated evidence supports that England was banned based on the content of The Red Mean.  As the Court noted in its analysis above, the first reason JCPL provided for banning England was that Reed "felt the poem was threatening," especially considering "the imagery discussing death and horrific images." (Filing No. 32 at 10.) The evidence demonstrates that England would not have been permanently banned had he left a blank piece of paper or anodyne note in a box of masks. He was banned because the message the poem expressed was viewed as caustic and unpleasant which supports that he was banned because of its content.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015) ("Government regulation of speech is content

based if a law applies to particular speech because of the topic discussed or the idea or message expressed" or where it "cannot be justified without reference to the content of the regulated speech or [was] adopted by the government because of disagreement with the message the speech conveys.") (internal quotation and citation omitted).

Generally, the strict scrutiny standard equates to a type of "end-and-means test that asks whether the state's purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest." *Republican Party of Minnesota v. White*, 416 F.3d 738, 750 (8th Cir. 2005). The strict scrutiny analysis requires the state to show that the exclusion "that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest." *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989).  JCPL does not meet this burden.

The inquiry to determine whether the state interest is sufficiently compelling to abridge core constitutional rights is informed by examining the regulation purportedly addressing that interest. *See* 416 F.3d 738, 750. JCPL contends that the compelling government interest is "provid[ing] library services for the entire county". (Filing No. 32 at 28.) It argues that its regulation (banning England) is derived from the Property Policy which is narrowly tailored to further JCPL's significant interest in providing library services to the country.  *Id*.  JCPL asserts that the Property Policy does not bar political discussion and only bars sharing opinions in an abusive, disruptive, or threatening manner. *Id*. Reviewing the available evidence supports the conclusion that England was neither abusive nor threatening when he left his poem at the circulation desk and the library has not submitted evidence sufficient to support that England's quiet dissemination of The Red Mean was disruptive.  While the Property Policy itself was content

neutral, as applied against England, JCPL engaged in content-based restrictions on his permitted expressive activity.

In conducting the heightened scrutiny analysis, the Court finds that although providing library services to the county is a significant government interest, the regulation as applied by JCPL to address it—instituting a permanent ban against England—was not necessary to actually advance that interest. *See* 416 F.3d at 751 (A narrowly tailored regulation is one that actually advances the state's interest (is necessary)). JCPL's decision to ban England was not a narrowly tailored means to achieve the stated interest of providing library services to the county. *See* 489 U.S. at 222 (finding that once a state interest is found to be sufficiently compelling, the regulation addressing that interest must be narrowly tailored to serve that interest). Further, England's ban was in no way the least restrictive means to further the interest of providing library services and JCPL could have instituted another regulation which advanced that interest with far less infringement of protected speech. JCPL's exclusion was a time, place, or manner restriction and does not satisfy the strict scrutiny analysis. *See Kreimer*, 958 F.2d at 1262 (holding "time, place or manner regulations that limit permitted First Amendment activities . . . are constitutional only if they are narrowly tailored to serve a significant governmental interest and . . . leave open ample alternative channels for communication of information") (internal quotation marks and citations omitted).

The evidence supports that there exist no genuine issues of material fact in dispute and the Court finds that JCPL violated England's First Amendment right to engage in protected speech. England's argument that his permanent ban from the Seymour Library violated his right to receive information is parallel to his claim that JCPL violated his right to engage in speech. As outlined above, JCPL fails to demonstrate that the permanent ban could overcome a heightened scrutiny

analysis.  *See Armstrong*, 154 F. Supp. 2d at 77 (determining that the "stricter, 'narrowly tailored' standard of review" was appropriate for a regulation preventing a patron "from engaging in *any* conduct or activity within the Library") (quoting *Perry*, 460 U.S. at 46).  This determination resolves England's second claim under the First Amendment as his ban from the Seymour Library unconstitutionally impinged on the well-established right to receive information.  *See Stanley*, 394 U.S. at 564 ("It is now well established that the Constitution protects the right to receive information and ideas."); *see also Griswold v. Connecticut*, 381 U.S. 479, 482–483, (1965); *Kreimer*, 958 F.2d at 1256.

Accordingly, the Court finds JCPL violated England's First Amendment right to engage in protected speech and receive information and therefore **grants** England summary judgment on his First Amendment claims.  JCPL is **denied** summary judgment on this issue.

**B.**     **Fourteenth Amendment Claims**

The Fourteenth Amendment establishes that, "No State shall . . . . deprive any person of life, liberty, or property, without due process of law. . .".  U.S. Const. amend. XIV.  In a procedural due process claim, the deprivation by the state of a constitutionally protected interest in "life, liberty, or property" is not in and of itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law.  *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1020 (7th Cir. 2000).  Procedural due process claims involve "a two-step inquiry: (1) whether the defendants deprived the plaintiffs of a constitutionally protected liberty or property interest; and (2) if so, whether that deprivation occurred without due process of law." *Doe v. Heck*, 327 F.3d 492, 526 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125, 110 (1990).

19

England asserts that he has a protected liberty interest in visiting the Seymour Library (Filing No. 24 at 14).  JCPL does not dispute or challenge England's claim to a liberty interest in visiting the Seymour Library and acknowledges the First Amendment right to receive information which "includes some level of access to public libraries." (Filing No. 32 at 28) (quoting *Doyle v. Clark County Public Library*, 2007 WL 2407051, *4 (S.D. Ohio Aug. 2, 2007).  However, JCPL argues that any liberty interest is limited.  *Id*.

Based on the evaluation of England's First Amendment claims, the Court determines he satisfies the first prong of the procedural due process analysis because JCPL deprived him of a constitutionally protected liberty interest when it impinged on his right to receive information by permanently banning him from the Seymour Library.  *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) ("While this court has not attempted to define with exactness the liberty … guaranteed (by the Fourteenth Amendment), the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes . . . the right of the individual to . . . acquire useful knowledge . . . .") (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). The Court now moves to the second prong of the inquiry to determine whether the deprivation of England's liberty interest in receiving information "was done without due process of law." *Heck*, 327 F.3d at 526.

England contends that JCPL does not afford library patrons any process, much less a constitutionally sufficient process to challenge bans (Filing No. 24 at 17).  JCPL disputes this contention and maintains the Seymour Library Property Policy provided England adequate process to challenge his ban (Filing No. 32 at 29).  The Property Policy states, in relevant part,

> Should it become necessary to suspend or deny library privileges of a customer in order to protect library collections, facilities or other users, notification of the suspension will be made by the Administrator, other designated staff members and/or police.

Access to facilities and borrowing will be restored when the suspended customer demonstrates that the situation that caused the loss of privileges has been remediated; with the exception of confirmed evidence that materials have been returned with drug residue; at this point the customer will be banned and charged for the withdrawn material. Any customer who has privileges suspended under the terms of this policy may request a re-evaluation of the suspension by contacting Administration.

(Filing No. 22-1 at 59).

England argues that this policy is not an opportunity to challenge the factual basis supporting an imposed ban, but rather it is an opportunity for a patron to "plead for mercy and to convince the Library that the Library's version of events will not repeat itself." (Filing No. 24 at 17.) He asserts that even if the Property Policy's "vague 're-evaluation'" procedure was deemed a process to challenge a ban, it is unconstitutional. *Id.*

 JCPL argues the Seymour Library provided England "with an oral notification of the violation and written documentation was available in the police report." (Filing No. 32 at 31.) It contends notice was sufficient and Reed provided such notice when she requested the Seymour Police Department inform England that he had been banned due to the poem which upset them. *Id.* Further, JCPL argues England confirmed receipt of the notification and justification of his ban when he called Reed directly after speaking with the police. *Id.* at 32. JCPL asserts that England failed to "take advantage of the appeal process" provided by the Property Policy because "he never inquired about reinstatement or the process," after speaking with Reed following the ban. *Id.* JCPL states Reed "should be forgiven" for not wanting to argue with an "angry patron" on the day the decision was made. *Id.*

As noted by JCPL, due process is a "flexible concept that varies with the particular situation." *Zinermon*, 494 U.S. at 127. In determining what procedural protections are required by the Constitution for a particular situation, the Court weighs several factors:

21

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

England argues an examination of the *Matthews* factors is not required because JCPL's re-evaluation procedure lacks at least five necessary and basic facets of constitutional process. He asserts the JCPL re-evaluation procedure lacked: (1) written explanation of the action taken against him and the reasons for that action; (2) being informed of the process for challenging the adverse action taken; (3) an effective opportunity to defend by confronting any adverse witnesses and by presenting his own argument and evidence; (4) an impartial decision maker to resolve a challenge to the state action; and (5) an opportunity to be heard before the deprivation of any significant liberty interest (Filing No. 24 at 18–20).

The Court agrees with JCPL's contention that due process is "not so rigid as to mandate all of [England's proposed] 'requirements' in the library context." (Filing No. 32 at 33). However, a review of the available evidence shows there are several fatal deficiencies to the process JCPL describes for patrons to challenge bans or indefinite suspensions. The two most glaring issues identified by the Court are (1) England was not provided an opportunity to be heard before the deprivation of his protected liberty interest; and (2) he was never advised of his right to review the decision to ban him or how to challenge it. The Court finds these two undisputed facts doom JCPL's argument that its re-evaluation procedure provided adequate process.

It is undisputed that that JCPL did not provide England with any kind of hearing before he was banned from the library. JCPL argues it was justified in not providing a pre-deprivation hearing because of the threatening nature of England's poem and the library staff's fears (Filing

No. 32 at 34; Filing No. 31-2 at 3; Filing No. 31-3 at 3). However, the Court has determined that England's poem did not constitute a "true threat," and was mere "political hyperbole." *Watts*, 394 U.S. at 708. Regardless, there is no evidence in the record to suggest England was violent or presented a threat of violence to the point that a pre-deprivation hearing could not be accommodated. Further, England had already left the Seymour Library by the time the poem was discovered and JCPL does not explain why a pre-deprivation hearing could not be offered and arranged after library staff confirmed no threat existed.

The Supreme Court has held that the Constitution generally requires "some kind of hearing *before* the State deprives a person of liberty or property." *Zinermon*, 494 U.S. at 127 (emphasis in original). Indeed, the "root requirement of the Due Process Clause" is that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1985); *see also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978) (hearing required before disconnecting utility service); *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (stating that at minimum, due process requires "*some* kind of notice and ... *some* kind of hearing" (emphasis in original); *Fuentes v. Shevin*, 407 U.S. 67, 80–84 (1972) (hearing required before issuance of writ permitting property repossession); *Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ("The fundamental requisite of due process of law is the opportunity to be heard."). In addition to a hearing before the deprivation of the protected interest, the hearing must be "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). The record reflects England was never given an opportunity to be heard at a hearing conducted at a meaningful time and in a meaningful manner. *See Goldberg v. Kelly*, 397 U.S. 254, 268–69 (1970) ("The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard.").

JCPL argues that England is free to request a "post-deprivation review from Reed at any time, reducing any risk of erroneous deprivation." (Filing No. 32 at 34.) The post-deprivation review referenced by JCPL would consist of England going to speak with Reed to "try and convince her" to have his rights restored and the applicable standard would be dependent "on the conversation and how [Reed] felt." (Filing No. 22-1 at 45.) The Court finds this option to be insufficient to satisfy due process because "where the State feasibly can provide a predeprivation hearing before taking [a liberty interest], it generally must do so regardless of the adequacy of a postdeprivation . . . remedy to compensate for the taking."  494 U.S. at 132.

England's position that the *Parratt* doctrine is inapplicable here is well-taken.  *See Parratt v. Taylor*, 451 U.S. 527, 543–44 (1981). "*Parratt* essentially stands for the rule that when predeprivation hearings are impractical because the actions of the state officers were 'random and unauthorized' the state is only responsible for providing postdeprivation remedies." *Veterans Legal Defense Fund v. Schwartz*, 330 F.3d 937, 940 (7th Cir. 2003).  JCPL does not argue that Reed acted in a "random and unauthorized" fashion which would make a pre-deprivation hearing impractical and justify a post-deprivation hearing.  JCPL contends Reed acted in accordance with the established procedure of the Property Policy and does not provide any explanation as to why a pre-deprivation hearing could not be held after the library staff concluded England's poem presented no threat. Accordingly, *Parratt* is inapplicable in this case. *See Schepers v. Commissioner*, 691 F.3d 909, 916 (7th Cir. 2012) ("Where, however, the state has an opportunity to provide pre-deprivation process because the deprivation is the result of some established state procedure, the *Parratt* doctrine does not apply.") (internal quotation marks omitted).

Finally, JCPL concedes that it did not advise England of his right to review the decision to ban him and the process to appeal the decision (Filing No. 38 at 20).  JCPL defends this position

by arguing that the Seymour Library conspicuously posts its Property Policy on its website and on the property, and England was previously given a copy of the policy two years earlier in 2018. *Id.* The Court finds this explanation is insufficient to support that England was properly apprised of the procedure to protest the deprivation of his protected liberty interest in November 2020. *See Memphis Light, Gas & Water Div.*, 436 U.S. at 14–15. ("Notice . . . does not comport with constitutional requirements when it does not advise [an individual] of the availability of a procedure for protesting a [deprivation of a protected interest] as unjustified."). JCPL has failed to demonstrate that it provided England with adequate process.

In weighing the factors set out in the *Matthews* equation, the Court finds that England's protected liberty interest in receiving information via library access is significant. *See Kreimer*, 958 F.2d at 1255 ("At the threshold, however, this right, … refined in later First Amendment jurisprudence, includes the right to some level of access to a public library, the quintessential locus of the receipt of information."). Second, the Court determines there was a high risk of erroneous deprivation of England's significant liberty interest through the procedure used by JCPL and there existed substitute procedural safeguards to prevent such a deprivation (such as confirming England's poem presented no threat and offering a pre-deprivation hearing before instituting a permanent ban). Finally, JCPL's interest in providing library services free from disruption or threat of danger would not have been fiscally or administratively burdened by implementing substitute procedural requirements such as providing a pre-deprivation hearing. *Mathews*, 424 U.S. at 335. A balancing of the *Matthews* factors with respect to England's interests and JCPL's interests, weighs in favor of England. The Court finds that JCPL violated England's procedural due process rights under the Fourteenth Amendment.

The resolution of England's First Amendment and due process claim entitles him to full reinstatement of his library privileges and a permanent injunction enjoining continued enforcement of the ban from the Seymour Library. Accordingly, the Court **grants** England summary judgment on his Fourteenth Amendment Due Process claims and **denies** JCPL summary judgment on this issue.

## IV.    CONCLUSION

For the preceding reasons, the Court concludes that Defendant Jackson County Public Library violated and is violating Plaintiff Richard England's rights under the First and Fourteenth Amendments to the United States Constitution by permanently banning him from the Jackson County Public Library for exercising protected speech. The Court **GRANTS** England's Motion for Summary Judgment (Filing No. 22) and **DENIES** JCPL's Cross-Motion for Summary Judgment (Filing No. 31). Judgment will be entered accordingly and the Court will issue a separate Order regarding declaratory judgment and the injunctive relief requested.

**SO ORDERED.**

Date:   3/31/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Alexander Phillip Will
FROST BROWN TODD LLC (Indianapolis)
awill@fbtlaw.com